UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MRIDUL BHAREL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 20CV6822 |
| | ) | |
| vs. | ) | Judge Durkin |
| | ) | |
| **LOUIS DeJOY, AS POSTMASTER GENERAL OF** | ) | |
| **UNITED STATES POSTAL SERVICE.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Mridul Bharel ("Bharel" or "Plaintiff"), by and through his counsel, the Law Offices of Michael T. Smith & Associates, PC, respectfully submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. For the reasons set forth herein, Plaintiff respectfully requests that this court deny Defendant's motion in its entirety.

**INTRODUCTION**

In this case, Plaintiff, a loyal United States Postal Service ("USPS" or "Defendant") employee nearly 30 years, sought to receive promotions and earn higher wages, as any good hardworking American tends to do. Unfortunately, Plaintiff hit roadblocks along the way that he believed were the result him not being the preferred race and national origin. In 2015, he asserted his right to file an EEO charge against Defendant, which Defendant has made him pay for dearly. While there is no smoking gun evidence in this case, there is copious amounts of smoke, and as the adage goes, when there is smoke, there is fire. When the facts in this case are reviewed in their entirety, there is plenty for any reasonable trier of fact to determine that, in fact, Plaintiff was retaliated against for asserting his civil rights.

**FACTUAL BACKGROUND**

Plaintiff (Asian race, Indian national origin) has been employed with the United States Postal Service ("USPS" or "Defendant") since approximately 1995. Plaintiff started as a part

1

time clerk and later obtained a full-time clerk position. In 2010, Plaintiff became a supervisor of distribution operations ("SDO") at the Palatine Processing and Distribution Center ("P&DC"), which is a non-union position. Between 2011 and 2014, Plaintiff was detailed to acting manager of distribution operations ("MDO") and operations support specialist positions, which are temporary assignments to MDO positions. In or around 2014, Plaintiff was promoted to a permanent level 20 MDO position at Defendant's Busse facility. In 2016, Plaintiff accepted a downgrade to a level 19 manager of field maintenance operations ("MFMO") position in Chicago District. In March of 2022, Plaintiff obtained a level 21 MMO position at Defendant's Busse location. (PSAF ¶ 1). Due to USPS's compensation structure/policy, individuals in supervisor positions typically earn considerably more than individuals in manager level positions, despite the fact that managers are a higher level in USPS's organizational structure than supervisors, because supervisors earn overtime for each out worked in a week over 40 and managers do not. (PSAF ¶ 2).

Plaintiff filed an EEO charge in or around 2015 against various management officials at Defendant's Busse location alleging that he was discriminated against on the basis of his race, national origin, color, and religion when he did not receive various positions that he applied for, was demeaned by management, and was threatened with discipline by management, among various other claims. As a resolution to this charge, Plaintiff requested that he be transferred out of Defendant's Busse location to avoid being retaliated against. As part of a settlement of his EEO charge, Plaintiff was transferred into a level 19 MFMO position at Defendant's Chicago P&DC location. (PSAF ¶ 3).

Plaintiff testified that he was not particularly comfortable transferring into an MFMO position because, up until that point, his management experience had been in distribution operations, but he took the position as he wanted to get out of Busse and that was the only position offered to him. (PSAF ¶ 4). Unbeknownst to Plaintiff at the time, the position of MFMO was not covered under the Supervisor Differential Adjustment ("SDA"), which is a pay

adjustment made for managers and supervisors to avoid them earning less than their subordinate maintenance craft employees. Although, Plaintiff's position was listed under plant maintenance and comparatively his responsibilities were similar and higher than a supervisor of maintenance operations ("SMO"), which received a pay adjustment per the SDA, the MFMO position was still not covered under the SDA. Thus, Plaintiff was earning less than his SMO subordinates, without regard to any overtime pay. Plaintiff protested this pay discrepancy ever since he took the EEO settlement. (PSAF ¶ 5).

Since January 24, 2017, Plaintiff applied for 2 MDO positions and 2 MMO positions that he was not selected for:

    a. Job Posting number 10057780 (Requisition No. 10062561) for the position of 2355-0028, Level 21 Manager Maintenance Operations EAS, at the Chicago District, (Tour 1 Busse MMO).

    b. Job Posting number 10057779 (Requisition No. 10062560) for the position of 2355-0028, Level 21 Manager Maintenance Operations EAS, at the Chicago District (Tour 3 Busse MMO).

    c. Job Posting number 10079292 (Requisition No. 10085822) for the position of 2315-7140, Level 22 Manager Distribution Operations EAS, at the Lakeland District (February 2017 Palatine MDO).

    d. Job Posting number 10112307 (Requisition No. 10120816) for the position of 2315-7140, Level 22 Manager Distribution Operations EAS-22, Palatine, Illinois at the Lakeland District (June 2017 Palatine MDO).

    (PSAF ¶ 7).

For the MMO positions, job posting numbers 10057779 and 10057780, Ken Pelech (White, American) was the selecting official and Alesia Hope (Black, American) was the review committee chair. On the requirement by matrix form, Plaintiff received a zero for "not demonstrated" for KSA No. 4 (Ability to establish plans and priorities for tour maintenance

3

activities, including contingency plans for emergencies) and KSA No. 10 (Knowledge of quality and continuous improvement tools and techniques (e.g. Seven Basic Tools, Lean Six Sigma, etc.). (PSAF ¶ 8). Near the time that Plaintiff applied for the two MMO positions, Mr. Pelech said to Plaintiff, "They were wondering why you want to come back to Busse." Mr. Pelech did not elaborate on who "they" was. (PSAF ¶ 9).

Between the two vacant positions, only two applicants did not receive a zero on at least one of the KSAs. These applicants were Michelle King (Black, American) with a score of 18, and Yolanda Johnson (Black, American), with a score of 16. These applicants were in SMO positions at the time that they applied, with both having been in those positions since 2014. These applicants ultimately received the two vacant positions, despite the fact that their applications do not demonstrate greater knowledge or experience of KSA's 4 and 10 than Plaintiff's application. (PSAF ¶ 11). The other applicants receiving a score of zero on the matrix were John Almawi, Ronald Crumbley, Lonnie Marks, Timothy Murphy, and Fredy Thomas. In her EEO affidavit, Ms. Hope alleged under oath that the races and national origins of these individuals, as well as those of Ms. King and Ms. Johnson, were unknown to her, despite the fact that she had previously worked with Ms. King and Ms. Johnson in Detroit and all applicants were interviewed with her present. (PSAF ¶ 12). Mr. Pelech admitted that he conducted Plaintiff's performance evaluations and he had performed in his position as maintenance manager satisfactorily and that a maintenance manager position was a higher position than maintenance supervisor. (PSAF ¶ 13).

Regarding the manager of distribution operations position in Palatine, job posting number 10079292, the committee chair was Ricky Hilliard (Black, American) and the selecting official was Quitin Mayberry (Black, American). Mr. Hilliard was deposed in relation to Plaintiff's 2017 EEO charge that included this non-selection as one of his claims. (PSAF ¶ 14). The Review Committee ranked all of the applicants based on their applications and the eight (8) KSAs for the position. Complainant was ranked a "17" which was the top rating by the

committee based upon his written application, yet after an interview with Mr. Mayberry, he did not receive the position. Instead, the position went to Brenda Valentine (black, American, female, no prior EEO activity). (PSAF ¶ 15).

Plaintiff advised Mr. Pelech in an email that he did not receive the position in Palatine and stated, "I guess supervisors are better qualified than managers for promotions at USPS!" Mr. Pelech responded, "Unbelievable on your 'Not Selected' sounds like you're black balled. I just don't understand it." Plaintiff took Mr. Pelech's comment to be sarcastic as he had personally been responsible for deciding not to select him for the MMO positions in Busse, so it would not make sense if he was being genuinely compassionate or dumbfounded. (PSAF ¶ 16).

Regarding the manager of distribution operations position in Palatine – Lakeland District, job posting number 10112307, Mr. Hilliard was on the review committee, but the committee chair was Jill Dewey (White, American) and the selecting official was again Mr. Mayberry, although he was later replaced as the selecting official by Gary Kaiser (White, Caucasian). (PSAF ¶ 17). Although Plaintiff received the highest score for MDO position, job posting 10079292, based on his application, and the application that he submitted for MDO position, job posting 10112307, was identical to the application he submitted for MDO position, job posting 10079292, and was based upon identical KSA's, this time around, Plaintiff did not get an interview for the position and it was eventually awarded to Frances Locke (Black, American), who had only served as an acting MDO since September 2016. (PSAF ¶ 18).

On June 12, 2019, Plaintiff sent an email to Mr. Hilliard, who was the selecting official for a noncompetitive level 19 maintenance engineering specialist position, internal job posting 10313397, requesting to be considered for the position. Plaintiff had identified Mr. Hilliard as a responsible management official in the EEO charge he filed in 2017 for him issuing me non-recommendation letters for previous positions he applied for. Mr. Hilliard was deposed in relation to Plaintiff's 2017 EEO charge. (PSAF ¶ 19). On June 17, 2019, Plaintiff was interviewed by Mr. Hilliard for the maintenance engineering specialist position. During the

5

interview, Mr. Hilliard said to Plaintiff, "We are in different circumstances to talk this time," in reference to the EEO deposition he took in 2019 for Plaintiff's EEO charge. Mr. Hillard also said, "They were wondering why you want to come back to Busse." Plaintiff did not receive any response from Mr. Hilliard whether he had been awarded this position and he later learned he had not been awarded the position. (PSAF ¶ 20).

In August of 2019, Plaintiff applied for another noncompetitive position for which Mr. Hilliard was the selecting official, this time to a level 17 supervisor of maintenance operations position, internal job posting 10340481. Plaintiff did not receive an interview for the position, nor was he selected for the position. In October of 2019, Plaintiff applied for yet another noncompetitive level 17 supervisor of maintenance operations position, internal job posting 10360145 for which Mr. Hilliard was the selecting official. Plaintiff did not receive an interview for the position, nor was he selected for the position. (PSAF ¶ 21). In Plaintiff's position as a level 19 lead MFMO, he supervised and conducted performance evaluations of level 17 SMO's, yet Mr. Hilliard did not give him either of the SMO positions. Plaintiff would have earned considerably more had he been given either of the SMO positions because he would have been eligible for the SDA adjustment and overtime pay. (PSAF ¶ 22). After Plaintiff did not receive either of the downgraded SMO positions, he asked Mr. Pelech why he was not able to obtain even a supervisor level position, to which Mr. Pelech responded, "You aren't going anywhere. You are going to rot in this position," in reference to the MFMO position he had at the time. (PSAF ¶ 23).

Starting in 2019, Plaintiff's support staff was reduced from 3 SMOs, eventually down to zero SMOs in October of 2020. Upon Plaintiff's return from leave in August 2020, he discovered a back log of incomplete work and projects that were sent to the FMO department months ago. Plaintiff also discovered at that time that his only remaining SMO, Anthony Brown, was given scheduled leave and SMO Dixon who was overseeing the FMO department in Plaintiff's absence, was sent on a detail to work with Maintenance Manager Alesia Hope the

6

same day that he returned from leave. (PSAF ¶ 24). Plaintiff inquired with Lead Maintenance Manager Ken Pelech, who was also a responsible management official for the EEO charge Plaintiff filed in 2017 and was deposed in the investigation, why he was told that there was no one available and why no other supervisor was provided to his department. At the time, there were SMO's on Tour-2 (one of Plaintiff's tour) that were routinely supervising a low number of employees daily. Plaintiff's department was left with no supervisor and no other manager besides him, so he was forced to work as a supervisor and a manager daily. Plaintiff also had to work on his off days to provide coverage. (PSAF ¶ 25).

  Plaintiff was the only manager who was not provided with adequate supervisory support staff to run their department while other managers who only manage one tour were provided more supervisors than they were entitled to. Plaintiff was paid considerably less than the supervisors who had just left his department were being paid and, when he had to cover for them and do their job duties, as well as continue to do his own job duties, he did not receive any bump in pay. (PSAF ¶ 26). For instance, Plaintiff had to complete and provide employees with their daily assignments, even on days that he was off. He had to order supplies and equipment needed for repairs that the maintenance craft employees needed. He also had to perform time and attendance responsibilities daily, conduct attendance reviews with the employees, call employees by phone when there were emergencies reported from the field, accept phone calls USPS customers and write work orders, interact with other departmental managers regarding service requests they had sent to my department, call contractors to service the stations and branches, gather ordered supplies and provided them to the craft employees, receive and approve vacation and days off requests, canvass, create, and post the holiday schedules, conduct stand-up and safety talks with craft employees, and conduct investigations on complaints. These were all SMO duties that Plaintiff had to perform. (PSAF ¶ 27). Besides one inexperienced 204(b) supervisor that Plaintiff was given for less than 5 weeks, he was not given another SDO from October 2020 through March of 2022, when he obtained a level 21 MMO position at the

7

Busse location. Less than 3 months after Plaintiff left, his successor MFMO was given a permanent SMO for support. (PSAF ¶ 28).

On Thursday, August 20, 2020, Plaintiff wrote an email to Managers Alesia Hope and Ken Pelech with a file attachment of sixty-three (63) backlogged Open FSSP calls and projects that were reported months earlier while he was on leave. No work was started or completed on the open FSSP calls while he was on leave. Plaintiff did not receive a response. Plaintiff again requested a meeting with his manager, Mr. Pelech, on September 3, 2020, to address the open FSSP calls. Plaintiff's request for a meeting was ignored, again, and he was not provided with assistance to complete his work, despite the fact that he did not have any SMO's at the time. (PSAF ¶ 29).

On September 4, 2020, Plaintiff notified Mr. Pelech that he was expecting a child and provided him with a 3971 form to request advanced leave. When Plaintiff asked Mr. Palech to approve his leave, Mr. Pelech asked him personal questions regarding how and when the pregnancy occurred, which Plaintiff found odd. Plaintiff responded to Mr. Pelech by stating that the only reason he had to come see him was because he had exhausted my FMLA hours for the year and he had to submit a 3971 as a pre-notification for the expected birth of his child and that he would let him know when the child is born. Mr. Pelech stated "Weren't you and your wife going through a divorce last year?" Plaintiff became internally irritated because Mr. Pelech had previously shared sensitive personal information about him and his life with other supervisory employees. (PSAF ¶ 30). Plaintiff then pointed at the 3971 and asked Mr. Pelech to sign and date it. Mr. Pelech then said, "It is not filled out – it has no dates or hours listed." Plaintiff agreed and explained to him that he did not fill out the hours and dates because he does not know exactly when the baby will be born. Plaintiff told him when the due date was and added that he has no control over when the baby is actually born but that he would let him know when the baby is born and give him the exact hours and days that he needed off. Mr. Pelech then signed the form and said he would put the leave dates in when the child is born. (PSAF ¶

8

31).

Plaintiff notified Mr. Palech and the senior plant manager on September 27, 2020, that his son had been born and that he wanted to utilize 40 hours of advanced leave. Upon Plaintiff's return to work, however, Mr. Pelech provided him with a 3971 to sign that had the leave marked as unscheduled. Plaintiff was in disbelief that he was being given unscheduled leave for the birth of his child even though he had notified Mr. Pelech of the need for leave in advance. This unscheduled leave degraded Plaintiff's attendance record could have led to a disciplinary action being issued against me. In comparison, Mr. Pelech scheduled and approved leave for SMO Anthony Brown, who did not have preapproved leave, to cover time he was absent from August 27, 2020, through August 31, 2020. Mr. Brown was not issued any discipline for his absence. (PSAF ¶ 32).

On October 6, 2020, after Mr. Palech had removed the last SMO from Plaintiff's department, he gave him instructions to conduct an investigative interview with an employee who was not assigned to Plaintiff's department. Plaintiff followed Mr. Palech's instructions, however, Mr. Pelech had four supervisors on Tour-2 in other departments who could have handled the responsibility to conduct an investigative interview as front-line supervisors, but he gave the assignment to Plaintiff. When Plaintiff asked Mr. Pelech why he was being instructed to conduct an investigative interview for an employee who was not assigned to my department, he received an email back stating, "I expect you to do this investigation today. We can discuss your other issues later this morning." Mr. Palech never met with Plaintiff, even after he requested a meeting regarding this issue. (PSAF ¶ 33).

In 2019, an employee who was assigned to Plaintiff's department threatened his safety while he was on working. This employee barricaded Plaintiff and himself in his office and physically threatened Plaintiff. After the incident, Plaintiff requested a TAT assessment on this employee due to the threatening conduct and threats made towards him. Ken Pelech was made aware of the situation via email. Plaintiff never received the TAT assessment that he had

requested, nor was he informed why the employee was immediately placed back in his department. Plaintiff also filed a police report for the incident. Although, Plaintiff had specified that he did not feel safe around this employee, nothing was done by Pelech to mitigate his hostile behavior or the safety and security risks he presented to Plaintiff. (PSAF ¶ 34). On February 19, 2021, another incident occurred with the same employee after Plaintiff gave him his work assignment and he said, "If you keep fucking with me, you are going to get yourself hurt." Plaintiff reported the incident to management and against stated that he did not feel safe around this person. Management did nothing to resolve Plaintiff's safety and security concerns and no response or acknowledgement was provided to him. (PSAF ¶ 35).

On March 4, 2021, Plaintiff discovered from the USPS database that two EAS supervisors were administratively assigned to field maintenance operations, which is the department that Plaintiff managed. Specifically, SMO Sharon Williamson was granted a non-competitive lateral transfer to Plaintiff's department and Anthony Brown was administratively assigned to Plaintiff's department, but they were never actually sent to Plaintiff's department to support him. This ongoing issue of no support staff being assigned to Plaintiff caused him to have to complete work that should have by completed by Plaintiff's support staff. (PSAF ¶ 36).

## STANDARD OF REVIEW

Summary judgment is appropriate only when the record before the court demonstrate that there are no genuine issues of material fact, in which case the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine if a genuine issue of fact exists, the court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *Myers v. Hasara,* 226 F.3d 821, 825 (7th Cir. 2000). As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, "summary judgment motions do[ ] not denigrate the role of the jury." 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court explained that the summary judgment process "by no means authorizes trial on affidavits" and that "[c]redibility determinations, the

10

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* The Court further stated that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

For discrimination cases in particular, the Seventh Circuit has stated, "summary judgment is improper . . . where a material issue involves any weighing of conflicting indications of motive and intent." *Kasten v. Saint-Gobain Performance Plastics Corp.,* 703 F.3d 966, 974 (7th Cir. 2012) *quoting Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether ruling on a motion for summary judgment or for a directed verdict." *Payne v. Milwaukee County*, 146 F.3d 430, 432 (7th Cir. 1998) *citing Anderson,* 477 U.S. at 255. The Seventh Circuit has also specifically noted, "[w]e are particularly leery of resolving issues involving a state of mind on summary judgment. In fact, . . . [we have] stated that '[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.'" *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006) *citing McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir.2004) *quoting Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir.1976).

## ARGUMENT

In 2016, the Seventh Circuit decided to abolish the "rats nest of surplus tests" that had slowly but surely displaced common sense in deciding motions for summary judgment in employment discrimination matters. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764-766 (7th Cir. 2016) ("Today we reiterate that "convincing mosaic" is not a legal test . . . . From now on, any decision of a district court that treats this phrase as a legal requirement in an employment-discrimination case is subject to summary reversal, so that the district court can evaluate the evidence under the correct standard."). The new test to be applied when

11

considering a summary judgment motion on a claim of intentional discrimination is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence." *Id.* at 765. The *Ortiz* Court noted that its holding "does not concern *McDonnell Douglas* or any other burden-shifting framework," but it reiterated that "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

Plaintiff alleges that he was subjected to discrimination based upon race and national origin and retaliated against for engaging in EEO activity, namely the filing of his EEO charge in 2015, when he was denied promotions to level 21 and level 22 positions in 2017. Plaintiff further alleges that he was retaliated against for filing an EEO charge in 2017 for not receiving those promotions, when he was denied downward moves to supervisor level positions and subjected to a hostile work environment.

**I.   Denial Of Promotions To Level 21 And Level 22 Positions In 2017**

The level 21 MMO positions that Plaintiff sought in 2017 were given to two non-Asian, non-Indian individuals, one of which had never engaged in prior EEO activity. Defendant admits that demonstration of the knowledge, skills, and abilities (KSAs) relevant to a position's requirements may appear under education, *work experience*, the summary of accomplishments, and attachments (DSMF 9). Despite the fact that Plaintiff had been a maintenance manager for over a year, a manager of distribution operations for two years before that, and drafted an application that clearly and objectively demonstrated knowledge, skills, and experience for all KSAs (*see* PSAF ¶ 10), Ms. Hope inexplicably gave him a zero for "not demonstrated" for two KSAs. While Plaintiff was able to get an interview regardless of Ms. Hope's discriminatory rating, this did not save Plaintiff as the deciding official was Mr. Pelech was aware of Plaintiff's

prior EEO activity (DSMF ¶ 40) and decided to give the positions to two supervisor level employees. Mr. Pelech also dropped hints to Plaintiff that retaliatory intent was afoot, for instance, when he told Plaintiff, "They were wondering why you want to come back to Busse." Clearly, Mr. Pelech was in contact with the individuals in Busse that Plaintiff had previously filed an EEO against. Mr. Pelech failing to award Plaintiff one of the positions was also perplexing in that he had worked with Plaintiff for some time and he admitted that he conducted Plaintiff's performance evaluations and that he had performed in his position as maintenance manager satisfactorily.

The circumstances surrounding the failure to award Plaintiff either of the two MDO positions in Busse in 2017 is even more bizarre. With Mr. Hilliard as the committee chairperson, presumably before he was aware of Plaintiff's prior EEO activity, Plaintiff was given the highest score on the KSAs for the first MDO position, but was then stonewalled by Mr. Mayberry for the position. Even if Plaintiff has come up short on evidence of discriminatory intent regarding this first MDO position, the fact that Plaintiff submitted the exact same application for the exact same position but was not even able to break the top five on his KSA scores to receive an interview on the second MDO position is confounding. Defendant argues that the discrepancy in his scores is because there were different applicants, but that is not a persuasive argument without the raw KSA scores, which Defendant did not provide to Plaintiff during discovery and did not attach to its Motion for Summary Judgment. Curiously, out of all the positions at issue in this lawsuit, this was the only position for which a requirement by matrix form revealing his raw KSA scores was not produced.

Although Plaintiff had previously been an MDO for 2 years and an acting MDO for 3 years before that, the position was ultimately given to someone who had only served as an acting MDO for less than a year. Mr. Pelech's coy, and frankly cruel, comment to Plaintiff that he had been "blackballed" and that he "just did not understand it," combined with Mr. Pelech's later comment that Plaintiff was "not going to anywhere" and that he was going "to rot" in his

position reveals that there was, indeed, a concerted effort to retaliate against Plaintiff by rendering him utterly immobile within USPS's hierarchy.

## II. Denial Of Downgrade Transfers To Supervisor Level Positions

Defendant argues that Plaintiff cannot assert a claim for Defendant's failure to grant him with "lateral" transfers to two lower-level supervisor positions because they were dismissed as untimely when he attempted to file an EEO charge on this issue. Plaintiff, however, does not need to exhaust administrative remedies relating to actions that occurred in retaliation for filing a previous EEO charge. *See Griffin v. Chi. Hous. Auth.,* 2014 U.S. Dist. LEXIS 164118, 10-11 (N.D. Ill. Nov. 24, 2014) citing *Heuer v. Weil-McLain*, 203 F.3d 1021, 1023 (7th Cir. 2001) ("Retaliation claims arising from the filing of an EEOC charge need not comply with the exhaustion requirement.").

By the time that Plaintiff had applied with Mr. Hilliard for two noncompetitive maintenance supervisor positions in 2019, Mr. Hilliard was fully aware that Plaintiff had filed an EEO charge against him because he had already been deposed in relation to that EEO charge. Mr. Hilliard even went as far as letting Plaintiff know that he was cognizant of his previous EEO charge during his interview with Plaintiff for the maintenance engineering specialist position when he said, "We are in different circumstances to talk this time." It seems that Mr. Hilliard had not forgotten about Plaintiff's EEO charge, and he wanted to make sure Plaintiff knew that. Plaintiff, of course, was not even given an interview for the two SMO positions, even though he was looking to downgrade from a maintenance manager position to a maintenance supervisor position. There can be no question that Plaintiff was qualified for these positions and Hilliard's failure to grant him an interview was purely in retaliation for Plaintiff's prior EEO activity against him.

## III. Retaliatory Hostile Work Environment

"To prevail on his hostile environment claim, [a plaintiff] must show that his work environment was objectively hostile." *Shanoff v. Ill. Dep't of Human Servs.,* 258 F.3d 696, 704

14

(7th Cir. Ill. 2001) (quotations and citations omitted). "An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Id.* (quotations and citations omitted). "In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* (quotations and citations omitted). "Regarding the frequency of the harassment, there is no 'magic number' of incidents that give rise to a cause of action." *Id.* (quotations and citations omitted). Lastly, the plaintiff need not show that the alleged conduct was both severe *and* pervasive; either is sufficient. *Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir. 1999).

In the case at bar, Plaintiff was subjected to a sufficiently severe *and* pervasive hostile work environment when (1) he had all supervisory support staff taken away while other departments had more than enough supervisors and was forced to perform the work of manager and supervisor, but was only given the lesser of two positions' pay; (2) was forced to work with someone who barricaded him in a room and was threatened with physical harm; (3) was not given any assistance when he was backlogged after returning from leave and was denied even a meeting to discuss the issue; (4) had his leave designated as unscheduled leave after the birth of his child, despite the fact that he did everything exactly by the book to schedule this leave; (5) had inappropriate comments made to him when requesting leave; (6) was told that he was "blackballed" and that he would "rott" in his position; (7) was given an assignment to perform an investigation for another department's employee when he was already short staffed and trying to catch up on his own work and was denied a meeting to discuss the issue; and (8) and was denied supervisory support staff that had been administratively assigned to his department.

## **CONCLUSION**

For all of the factual and legal arguments discussed above, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment in its entirety.

| | |
|---|---|
| Dated: June 19, 2023 | Respectfully Submitted,<br>**MRIDUL BHAREL** |
| Michael T. Smith #6180407 IL<br>Attorney for Plaintiff<br>LAW OFFICES OF MICHAEL T. SMITH &<br>ASSOCIATES, PC<br>10 N. Martingale Road, Suite 400<br>Schaumburg, IL  60173<br>(847) 466-1099 | By: /s/Michael T. Smith |

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 19, 2023, I electronically filed **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

      By:    s/Michael T. Smith
              Michael T. Smith #6180407IL
              Attorney for Plaintiff
              LAW OFFICES OF MICHAEL T. SMITH & ASSOCIATES, PC
              10 N. Martingale Road, Suite 400
              Schaumburg, IL  60173
              (847) 466-1099