**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Mridul Bharel, | |
| Plaintiff, | |
| v. | Case No. 20 C 6822 |
| Louis DeJoy, as Postmaster General of United States Postal Service, | Hon. LaShonda A. Hunt |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mridul Bharel filed this suit against his employer, the United States Postal Service ("USPS"), asserting claims under Title VII of the Civil Rights Act of 1964 for race discrimination (Count I), national origin discrimination (Count II), and retaliation (Count III). Defendant Louis DeJoy, as Postmaster General of USPS, filed a motion for summary judgment. For the reasons discussed below, Defendant's motion for summary judgment (Dkt. 41) is granted.

**BACKGROUND**

The facts are taken from the parties' Local Rule 56.1 statements and are undisputed except where noted. Plaintiff is an Asian male of Indian descent. (Def.'s Resp. to Pl.'s SOAF ¶ 1). Plaintiff started as a part-time clerk with USPS in 1995, and he later obtained a full-time clerk position. (*Id*.) Plaintiff became part of USPS management in 2010, after he was appointed to an Executive and Administrative Schedule ("EAS") level 17 supervisor of distribution operations ("SDO") position at the Palatine Processing and Distribution Center ("Palatine P&DC"). (*Id*.; Pl.'s Resp. to Def's SOF ¶ 1). While in the SDO role, Plaintiff was periodically detailed to acting manager of distribution operations ("MDO") and operations support specialist positions classified at EAS level 20 or below. (Def.'s Resp. to Pl.'s SOAF ¶ 1). In or around 2014, Plaintiff was promoted to a permanent EAS level 20 MDO position at USPS's Busse metro surface hub facility ("Busse

1

facility"). (*Id*.; Pl.'s Resp. to Def's SOF ¶ 1). Then, in April 2016, as part of the settlement of an administrative Equal Employment Opportunity Commission ("EEOC") complaint against USPS, Plaintiff agreed to reassignment from his EAS level 20 MDO position to an EAS level 19 manager of field maintenance operations ("MFMO") position at USPS's Cardiss Collins Processing and Distribution Center. (Pl.'s Resp. to Def.'s SOF ¶ 2).

Plaintiff contends, that when he accepted the reassignment, he was unaware of the pay structure for the position. (Def.'s Resp. to Pl.'s SOAF ¶ 5). Specifically, under USPS's pay structure, certain FLSA-exempt supervisor positions and other EAS level 18 and below positions are eligible for "straight time" pay or "overtime" pay. (*Id*. ¶ 2). The MFMO position that Plaintiff accepted, however, was not straight time or overtime eligible and it was not covered under the Supervisor Differential Adjustment ("SDA"), a pay adjustment made for managers and supervisors to avoid them earning less than their subordinate maintenance craft employees. (*Id*.) As a result, Plaintiff earned less than his supervisor of maintenance operations ("SMO") subordinates. (*Id*. ¶ 5). Plaintiff protested this pay discrepancy. (*Id*.)

I.    **Plaintiff's Application for Competitive Positions**

During his employment, Plaintiff applied for several competitive positions with USPS. The selection process for management level employees, like Plaintiff, is governed by USPS's Handbook EL-312, Employment and Placement, Section 74, "EAS Positions." (Pl. Resp. to Def.'s SOF ¶ 8). Pursuant to the handbook provision, when eleven or more applicants apply for a position, a review committee of at least three members is assembled. (*Id*.) The major functions of the review committee are to assist the selecting official in assessing the applicants and recommend candidates who best meet the qualifications of the vacant position. (*Id*.) Applicants are evaluated based on their demonstration of the knowledge, skills, and abilities ("KSAs") relevant to a position's

requirements. (*Id.* ¶ 9). Review committee members must rate an applicant's demonstration of the KSAs using the following scale:

- 0 points – Not demonstrated at minimum level.
- 1 point – Minimally acceptable.
- 2 points – Strong.
- 3 points – Excellent.

(*Id.* ¶ 10). The selecting official is responsible for identifying the applicant whose KSAs best meet the requirements of the position and who has a high probability of success in the position. (*Id.* ¶ 12).

### A. Manager Maintenance Operations Positions

On November 9, 2016, Plaintiff applied for Job Posting No. 10057780 (Manager Maintenance Operations ("MMO"), EAS level 21, Busse facility ("Tour 1 MMO Position")) and Job Posting No. 10057779 (MMO, EAS level 21, Busse facility ("Tour 3 MMO Position")).[1] (*Id.* ¶¶ 27, 28). For both the Tour 1 MMO Position and the Tour 3 MMO Position, Bernie Hudson and Stacey Parker were review committee members, Alesia Hope was the review committee chair, and Ken Pelech was the selecting official. (*Id.* ¶¶ 29-31).

There were four applicants for the Tour 1 MMO Position and seven applicants for the Tour 3 MMO Position. (*Id.* ¶ 32). For both positions, Hope rated Plaintiff as "0" for "not demonstrated" for KSA #4 (Ability to establish plans and priorities for tour maintenance activities, including contingency plans for emergencies) and KSA #10 (Knowledge of quality and continuous improvement tools and techniques (*e.g.* Seven Basic Tools, Lean Six Sigma, etc.)). (*Id.* ¶ 33). The review committee believed that Plaintiff failed to properly address the KSAs in his application, as

---

[1] The Tour 1 MMO Position and the Tour 3 MMO Position had different schedules. Specifically, the hours from the Tour 1 MMO Position were 11:00 PM to 7:00 AM and the hours for the Tour 3 MMO Position were 3:00 PM to 11:00 PM.

the format of his application was hard to follow and made it difficult to ascertain his exact work history. (*Id*. ¶ 34).

Between the Tour 1 MMO Position and the Tour 3 MMO Position, only two applicants, Michelle King and Yolanda Johnson, did not receive a zero on at least one of the KSAs. (*Id*. ¶ 35). Other applicants who received zeros were John Almawi, Ronald Crumbley, Lonnie Marks, Timothy Murphy, and Fredy Thomas. (*Id*.)

On January 24, 2017, Hope sent an email to Pelech and DeVette Murphy advising of the applicants' scores for the Tour 1 MMO Position and the Tour 3 MMO Position. (*Id*. ¶ 36). Hope recommended that Pelech interview most of the candidates who scored a zero, including Plaintiff. (*Id*.) While Pelech was not obligated to interview the applicants who were rated as a zero, he chose to do so because some people are better at addressing the KSAs in person than they are in writing. (*Id*. ¶ 37). Hope participated in the interviews and took notes. (*Id*.) Pelech made the final decision, with input and assistance from Hope. (*Id*.) Pelech selected Johnson (African American, black, female, no prior EEO activity) for the Tour 1 MMO Position and King (African American, black, female, prior EEO activity) for the Tour 3 MMO Position. (*Id*.)

Defendant maintains that the review committee did not consider Plaintiff's race, sex, color, national origin, or prior EEO activity in their decision to rate him as a zero based on his KSAs. (*Id*. ¶ 39). More specifically, Defendant asserts that Hope did not know Plaintiff's race, national origin, color, or whether he had engaged in prior EEO activity at the time of her decision. (*Id.* ¶ 40). Additionally, Defendant states that though Pelech was aware of Plaintiff's prior EEO activity, he did not take Plaintiff's protected conduct, nor his race, color, national origin or sex into consideration when making his selection decision. (*Id.*) Defendant further contends that Pelech selected Johnson and King because their written KSAs and interviews demonstrated they were the

4

best applicants for the positions. (*Id*. ¶ 41). Plaintiff, however, claims that King and Johnson were selected because of their race and national origin and to retaliate against Plaintiff. (*Id*.)

### B. February 2017 MDO Position

On or about February 8, 2017, Plaintiff applied for Job Posting No. 10079292 (MDO, level 22, Palatine P&DC) ("February 2017 MDO Position"). (*Id*. ¶ 42). Jill Dewey and Elizabeth Wulf were the review committee members, Ricky Hillard was the review committee chair, and Quintin Mayberry was the selecting official. (*Id*. ¶¶ 42-44). There were eleven applicants for the position. (*Id*. ¶ 45). The review committee ranked all the applicants based on the eight KSAs for the position. (*Id*.) Plaintiff was ranked a "17," which was the top rating by the committee. (*Id*.) Thus, Plaintiff was recommended for an interview. (*Id*. ¶ 47).

Plaintiff was interviewed on March 23, 2017. (*Id.*) Mayberry also set up interviews with three other recommended candidates with the following scores: Mark Gatling (13), Brenda Valentine (15), and Josephine Barlow-Flowers (15). (*Id*.) Defendant says that following the interviews, Mayberry did not believe Plaintiff was the most qualified candidate. (*Id*. ¶ 49). In his notes from Plaintiff's interview, Mayberry mentioned that Plaintiff did not know the answers to several questions because he had been away from mail processing for a while, and at the end of the interview, Plaintiff asked "when do I start." (*Id*.)

Mayberry selected Valentine (black, American, female, no prior EEO activity) for the February 2017 MDO Position because she provided more in-depth explanations during her interview, was more mail processing oriented, knew how to put together plans to improve service and efficiency, and was a team player. (*Id*. ¶ 50).

Plaintiff asserts that Mayberry did not select him because of his race, national origin, and because of his engagement in EEO protected activity. (*Id*. ¶ 52.) Defendant, however, contends

that while Mayberry was aware that Plaintiff had previously filed an EEO complaint, he did not factor this into his consideration on which candidate to select for the February 2017 MDO Position, nor did he consider Plaintiff's race, color, sex, or national origin. (*Id.*)

### C. July 2017 MDO Position

On July 5, 2017, Plaintiff applied for Job Posting No. 10112307 (MDO, level 22, Palatine P&DC) ("July 2017 MDO Position"). (*Id.* ¶ 53). Ricky Hilliard and Elizabeth Wulf were review committee members, Jill Dewey was the review committee chair, and Mayberry was the selecting official. (Pl.'s Resp. to Def's SOF ¶¶ 54, 55). However, in or around August 2017, Mayberry left the Palatine P&DC to work in another facility, so Gary Kaiser became the selecting official. (*Id.* ¶ 56).

Sixteen people applied for the July 2017 MDO Position. (*Id.* ¶ 57). The review committee recommended Frances Locke, Theresa Caminata, Timothy Murphy, Michelle Murchisonoliver, and Mark Gatling for interviews. (*Id.* ¶ 58). The review committee also found that Plaintiff, Smita Patel, Mary Kadeiza Ombeva-Mutiva, Fredy Thomas, Donald Bell, and Rhonda Thomas were eligible for the position, but they were not recommended for interviews. (*Id.* ¶ 59). Even though Plaintiff's applications for the February 2017 MDO Position and the July 2017 MDO Position were the same, Plaintiff did not rank high enough to be recommended for an interview for the July position because there were additional individuals that applied for the role. (*Id.* ¶ 60; Def.'s Resp. to Pl.'s SOAF ¶ 18). Specifically, four of the five candidates that were recommended for interviews—Locke, Caminata, Murphy, and Murchisonoliver—did not apply for the February 2017 MDO Position. (*Id.* ¶ 61).

Kaiser selected Locke (African American, black, female, no known EEO activity) for the July 2017 MDO Position. (*Id*. ¶ 62). Defendant contends, but Plaintiff disputes, that Locke had more in-plant experience than Plaintiff. (*Id*.)

## II.      Plaintiff's EEO Complaint Related to Applications for Competitive Positions (EEO Complaint No. 1J-607-0052-17)

On March 9, 2017, Plaintiff sought EEO counseling, alleging that he had not been selected for certain positions because of illegal race, color, national origin, and sex discrimination and in retaliation for prior EEO-protected activity. (*Id*. ¶ 4). The EEO dismissed the claims that occurred prior to January 24, 2017, because Plaintiff failed to contact an EEO counselor within the 45-day limit mandated by EEOC regulations. (*Id*)

The EEO accepted for investigation claims that occurred after January 24, 2017, including claims related to: (1) the Tour 1 MMO Position, (2) the Tour 3 MMO Position, (3) the February 2017 MDO Position, and (4) July 2017 MDO Position.[2] (*Id*. ¶ 5). Additionally, the EEO accepted for investigation Plaintiff's claim that he was not paid commensurate with his peers and subordinates. (*Id*.)

On June 21, 2021, following the investigation, the EEOC granted summary judgment in favor of USPS. (*Id*. ¶ 64). Additionally, the EEOC affirmed the procedural dismissal of Plaintiff's non-selection selection claims that occurred more than 45 days prior to Plaintiff contacting an EEO counselor. (*Id*. ¶ 65).

## III.      Plaintiff's Applications for Non-Competitive Positions

During his employment, Plaintiff also applied for several non-competitive positions with USPS. According to USPS's Handbook EL-312, employees seeking non-competitive placement

---

[2] The EEO also accepted other claims for investigation that are not at issue in this lawsuit.

into a position at the same or a lower level may submit a written request to the selecting official for consideration. (Ex. 3 at 10, Dkt. 43-8).

On June 12, 2019, Plaintiff requested to be considered for Job Posting No. 10313397 (EAS level 19, maintenance engineering specialist) ("MES Position"). (Def's Resp. to Pl.'s SOAF ¶ 19). On June 17, 2019, Plaintiff was interviewed by Hilliard, who served as the selecting official for the position. (*Id*. ¶ 20). Plaintiff did not receive any response from Hilliard regarding whether he had been awarded this position, but he later learned he did not receive the position. (*Id*.)

In August 2019, Plaintiff applied for Job Posting number 10340481 (EAS level 17, supervisor of maintenance operations) ("August 2019 SMO Position"). (*Id*. ¶ 21). Hillard was the selecting official. (*Id*.) Plaintiff did not receive an interview, nor was he selected for the August 2019 SMO Position. (*Id*.)

In October 2019, Plaintiff applied for Job Posting number 10360145 (EAS level 17, supervisor of maintenance operations) ("October 2019 SMO Position"). (*Id*. ¶ 21). Again, Hillard was the selecting official. (*Id*.) Plaintiff did not receive an interview, nor was he selected for the October 2019 SMO Position. (*Id*.)

**IV.   Plaintiff's EEO Complaint related to Non-competitive Positions (EEO Complaint No. 1J-531-0015-20)**

On December 5, 2019, Plaintiff contacted an EEO counselor regarding his applications for the non-competitive positions. (*Id*. ¶¶ 68, 69). On March 4, 2020, Plaintiff received notice of his right to file an individual complaint of discrimination, which warned Plaintiff that he had 15 days from the receipt thereof to file his discrimination complaint. (*Id*. ¶ 70). Additionally, a poster about time limits to contact an EEO counsel was displayed at Plaintiff's workplace. (*Id*.) Plaintiff filed a formal complaint of discrimination on April 1, 2020. (*Id*.)

8

On April 16, 2020, USPS dismissed Plaintiff's EEO complaint as to the MES Position and the August 2019 SMO Position due to Plaintiff's failure to contact an EEO counselor within the 45-day time limit, and ultimately dismissed all of Plaintiff's claims due to his failure to file his administrative EEO complaint within 15 days of receiving the notice of right to file a complaint of discrimination. (*Id.*) Plaintiff appealed the dismissal of his EEO complaint. (*Id.*) The EEOC's Office of Federal Operations ("EEOC OFO") affirmed the dismissal on November 30, 2020. (*Id.*) On December 31, 2020, Plaintiff submitted a request that the EEOC OFO reconsider its affirmance of the dismissal of his EEO complaint, which was denied by the EEOC OFO on March 11, 2021. (*Id.*)

## V.    **Plaintiff's Workplace Concerns**

During his employment, Plaintiff raised several workplace related concerns, including:

- Plaintiff's staffing was inadequate to run his department, and he was required to perform both manager and supervisor duties.

- Plaintiff was not properly compensated for the amount of work he performed.

- On September 3, 2020, Plaintiff requested to meet with his manager, and his request was ignored.

- On or about September 4, 2020, Pelech asked Plaintiff personal questions about his wife's pregnancy, including when it occurred.

- Around the end of September 2020, Plaintiff's scheduled leave was marked as unscheduled.

- On October 6, 2020, Plaintiff was instructed to give an investigative interview to an employee who was not assigned to his department.

- On or about December 7, 2020, Plaintiff was notified that he did not qualify for the SDA provision.

- On or about February 19, 2021, Plaintiff was threatened by another employee and Plaintiff's superiors failed to take appropriate action when he reported the incident.

- On March 4, 2021, Plaintiff became aware that two supervisors were administratively assigned to his department but were working elsewhere.

(*Id.* ¶ 73).

## VI. Plaintiff's EEO Complaint related to Workplace Concerns (EEO Complaint No. 1J-607-0079-20)

On or around November 9, 2020, Plaintiff filed an EEO complaint regarding his workplace concerns related to inadequate staffing, workload, and unequal pay. (*Id.* ¶ 71). The administrative complaint was investigated and, on July 12, 2021, the EEOC issued a final decision finding no discrimination or retaliation. (*Id.*) A copy of the final agency decision was delivered to Plaintiff and his attorney on July 15, 2021. (*Id.*) The notice informed Plaintiff and his attorney that they were required to file suit in district court no later than 90 days after receipt thereof. (*Id.*)

Plaintiff initiated this litigation raising claims related to his non-selection for the competitive positions and the non-competitive positions, as well as a list of other workplace concerns. Defendant moved for summary judgment on all of Plaintiff's claims. The motion is fully briefed and ripe for ruling.

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). In cases where the movant does not bear the burden of proof, the movant must simply point to an absence of evidence to support the nonmovant's case. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v, Catrett*, 477 U.S. 317, 324 (1986), and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). All

10

facts and inferences are construed in the light most favorable to the nonmoving party. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

## DISCUSSION

Plaintiff asserts that he was denied job promotions and transfers and subject to negative working conditions because of his race, national origin, and previous filing of an EEO charge. Defendant, however, argues that Plaintiff has failed to prove that any of the complained of employment decisions or conditions were due to discrimination or retaliation. Additionally, Defendant contends that Plaintiff failed to exhaust his administrative remedies prior to filing suit. Having considered the parties' arguments and reviewed the record, the Court finds that, while Plaintiff's claims have been administratively exhausted, Plaintiff has failed to establish that the adverse employment actions were caused by his race, national origin, or prior EEO activity.

## I.    Exhaustion

As an initial matter, Defendant contends that the claims Plaintiff raised in his December 2019 EEO complaint (No. 1J-531-0015-20) regarding his applications for non-competitive positions are barred because Plaintiff (1) did not contact an EEO counselor within 45 days of the alleged retaliatory conduct and (2) failed to file his administrative EEO complaint within 15 days of receiving notice of his right to file. Similarly, Defendant contends that the claims Plaintiff raised in his November 2020 EEO complaint (No. 1J-607-0079-20) regarding workplace concerns are barred because Plaintiff filed his second amended complaint well after the 90-day time limit. In response, Plaintiff argues that he was not required to exhaust administrative remedies for actions that occurred in retaliation for filing a previous EEO charge. Plaintiff has the better argument.

"[G]enerally, a Title VII plaintiff may bring only those claims that were included in her original EEOC charge, or that are like or reasonably related to the allegations of the charge or

11

growing out of the charge." *Gawley v. Ind. Univ.*, 276 F.3d 301, 313 (7th Cir. 2001) (citing *McKenzie v. Ill. Dept. of Transp.,* 92 F.3d 473, 481 (1996)). "A well-recognized exception to this requirement exists, however, for suits complaining about retaliation for filing the first charge." *Schloss v. City of Chi.*, No. 18 C 1880, 2019 WL 6716613, at *3 (N.D. Ill. Dec. 10, 2019) (internal quotations omitted); *see also Gawley*, 276 F.3d at 314 n.8 ("Of course, an employee is not required to file a separate EEOC charge alleging retaliation when the retaliation occurs in response to the filing of the original EEOC charge."). Defendant contends that this exception does not apply here because Plaintiff's unexhausted claims arose from different factual circumstances and occurred during a different timeframe than his exhausted claims.

Defendant's position was rejected in *Schloss*. There, a former police officer received a right to sue letter from the EEOC regarding her discrimination claims. 2019 WL 6716613, at *3. Soon thereafter, her supervisors began soliciting complaints about her, accused her of professional misconduct, and transferred her to a different unit. *Id.* The defendant argued that the officer's post-charge retaliation claim did not reasonably relate to her EEOC charge because the new allegations involved different people, a different department, and a different time period. *Id.* at 2. The court disagreed, finding that plaintiff "explicitly allege[d] that the retaliation occurred because of the filing of the EEOC charge, her participation in the EEOC investigation, and her pursuit of this lawsuit." *Id.* at 3. Accordingly, the court held that plaintiff "did not need to file a second EEOC charge to bring a claim against [defendant] for retaliation to the extent she alleges it was in response to her first charge." *Id.*

Similarly, Plaintiff contends that he was not selected for the competitive or the non-competitive positions and was subjected to workplace issues because he previously filed EEO charges. (*See* SAC ¶ 28). Plaintiff alleges that his "supervisors and managers were aware that he

had filed charges of discrimination with [USPS's] EEO office." (*Id*. ¶ 26). As such, the Court finds that Plaintiff was not required to file additional EEO charges regarding the challenged conduct. *See Schloss*, 2019 WL 6716613, at *3; *Johnson v. Pres. Mgmt., Inc.*, No. 21 C 02878, 2022 WL 16635558, at *3 (N.D. Ill. Nov. 2, 2022) (Plaintiff's allegations that defendant "engaged in the challenged conduct in retaliation for his filing of the EEOC complaint and the federal suit fit squarely within [the] exception."); *Methavichit v. Follenweider*, No. 20 C 2841, 2021 WL 6050061, at *6 (N.D. Ill. Dec. 21, 2021) ("The Seventh Circuit has repeatedly affirmed that a plaintiff need not file a separate EEOC charge to allege retaliation for filing a previous EEOC charge. . . . So, to the extent that [plaintiff] now claims that she was fired from her job and barred from being rehired in retaliation for filing her July 5 EEOC Charge, she has exhausted that claim.").

Whether Plaintiff has provided sufficient evidence to survive Defendant's motion for summary judgment is a separate question which the Court examines below.

## II.   **Merits**

To succeed on a Title VII discrimination claim, Plaintiff must prove (1) that he is a member of a protected class, (2) that he suffered an adverse employment action, and (3) causation. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citing *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018)). "The determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Likewise, to succeed on a Title VII retaliation claim, Plaintiff must be able to provide that (1) he engaged in activity protected; (2) he suffered an adverse employment action; and (3) his

protected activity and the adverse action(s) were causally connected. *Runkel v. City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022). "As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [adverse employment action]?'" *Igasaki*, 988 F.3d at 959 (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

For both discrimination and retaliation claims, "[t]he evidence presented 'must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself.'" *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Ortiz*, 834 F.3d at 765). Here, Defendant contends that Plaintiff's claims must be dismissed because (1) many of the alleged adverse actions are not actionable under Title VII and (2) there is no evidence that any of the actionable adverse actions were due to discrimination or retaliation.[3] In response, Plaintiff counters that when the evidence is viewed as a whole, as required under *Ortiz*, a reasonable factfinder could conclude that he was subject to discrimination and retaliation.

A.    **Adverse Actions**

For an employment action to be actionable, it must have left an employee "'worse off' with respect to the terms and conditions of his employment." *Phillips v. Baxter*, No. 23 C 1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346,

---

[3] In his reply brief, Defendant argues that Plaintiff failed to "establish[] pretext to withstand summary judgment." (Reply at 2, Dkt. 69). Pretext is an element of *McDonnell Douglas* that "both before and after *Ortiz*. . . [remains] a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Even so, "a plaintiff need not use the *McDonnell Douglas* framework after *Ortiz*. At summary judgment, what matters is whether a plaintiff presented enough evidence to allow the jury to find in his favor." *Igasaki*, 988 F.3d at 957-58. The pretext analysis probes a decisionmaker's motive for taking an employment action. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (explaining that pretext may be established "directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible"). Consequently, even under the holistic approach of *Ortiz*, the fact that the record is devoid of evidence of pretext may still be relevant—even if not dispositive—in assessing if summary judgment is proper.

359 (2024)). "Such actions include: (1) diminishing an employee's compensation, fringe benefits, or other financial terms of employment, including termination; (2) reducing long-term career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted; and (3) changing the conditions in which an employee works in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (internal quotations and alternations omitted).

Here, Plaintiff contends that he was subject to numerous adverse actions. An employer's actions that deprive an employee of compensation, promotions, and, in some cases, transfers to a lateral or downward position may constitute adverse actions. *See Gibbs v. Gen. Motors Corp.,* 104 F. App'x 580, 583 (7th Cir. 2004) ("For purposes of Title VII, an adverse employment action is one that affects the 'compensation, terms, conditions, or privileges of employment,' . . . such as denial of promotion[.]"); *Lewis v. City of Chi.,* 496 F.3d 645, 654 (7th Cir. 2007) ("An employer's actions which deprived the employee of compensation which []he otherwise would have earned clearly constitute adverse employment action for purposes of Title VII.") (internal quotations and alterations omitted); *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (Plaintiffs "claim that they were retaliated against when their requests for transfers to other hospitals were denied. That might be an adverse employment action, provided the transfer would have resulted in higher pay or benefits.").

Aside from his promotion, transfer, and compensation claims, Plaintiff contends that (1) his staffing was inadequate to run his department and, as a result, he was required to perform both manager and supervisor duties; (2) his request to meet with his manager was ignored; (3) his scheduled leave was marked as unscheduled; (4) Pelech asked him personal questions about his

wife's pregnancy; (5) he was instructed to give an investigative interview to an employee who was not assigned to his department; (6) he was threatened by another employee and his supervisors failed to take action after the incident was reported; and (7) two supervisors were administratively assigned to his department but were working elsewhere. Defendant argues that this "laundry list" of allegations is not actionable under Title VII. Plaintiff did not respond to Defendant's argument. Instead, apparently conceding that many of the alleged actions are not actionable, Plaintiff argues that he was subject to a hostile work environment.

"A hostile work environment qualifies as a materially adverse employment action." *Zegarra v. John Crane, Inc.,* 218 F. Supp. 3d 655, 667 (N.D. Ill. 2016) (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002)). For workplace conduct to constitute a hostile work environment actionable under Title VII, the harassment must be "sufficiently severe or pervasive to alter the conditions of his work environment." *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 637 (7th Cir. 2019). "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). "A workplace presents an objectively hostile work environment if it is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotations omitted). However, Title VII does not impose a "general civility code[;]" thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment." *Saxton v. Wolf*, 508 F. Supp. 3d 299, 310 (N.D. Ill. 2020) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Here, Plaintiff's allegations—other than those related to promotions, transfers, and compensation—amount to nothing more than "relatively isolated instances of non-severe misconduct[,]" which do not support a hostile environment claim. *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) (internal quotations and alterations omitted) (finding that heavy workload, along with other allegations, did not amount to a hostile work environment); *see also Silk v. City of Chi.*, 194 F.3d 788, 807 (7th Cir. 1999) (finding that police officer's allegation that he received threats of physical violence did not rise to the level of a hostile work environment); *Duniya v. Power*, No. 21 C 3399, 2023 WL 2755132, at *4 (N.D. Ill. Apr. 3, 2023) (finding that general workplace complaints, such as being assigned additional duties, having a temporary assignment cancelled, having other duties taken away from him, having work he completed credited to other employees, being verbally admonished during a meeting, receiving poor marks on his evaluation, having overtime payment requests denied, being bullied, and receiving a suspension, do not rise to the level of a hostile work environment).

Thus, the only actionable adverse employment actions that Plaintiff has alleged are those related to promotions, transfers, and compensation. The Court next considers whether Plaintiff has established causation related to the actionable adverse employment actions.

**B.    Causation**

To prove causation in a federal-sector discrimination case, Plaintiff must show that his race or national origin "played a part" in the alleged adverse employment action. *Crain v. McDonough*, 63 F.4th 585, 591 (7th Cir. 2023) (citing *Huff v. Buttigieg*, 42 F.4th 638, 647 (7th Cir. 2022), *reh'g denied,* No. 21-1257, 2022 WL 16640618 (7th Cir. Nov. 2, 2022)). Similarly, to prove causation

in the retaliation context, Plaintiff must show that the "employer's retaliatory animus played a part in an adverse employment action." *Huff*, 42 F.4th at 647. Plaintiff concedes that "there is no smoking gun evidence in this case." (Resp. at 1, Dkt. 58). This concession is not fatal to his claims, as Plaintiff can also stave off summary judgment by "offer[ing] circumstantial evidence of intentional retaliation, 'including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1118 (7th Cir. 2022) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

### 1. <u>Promotions</u>

Here, Plaintiff contends that he was discriminated against and retaliated against when he was denied promotions for the (1) Tour 1 MMO Position, (2) Tour 3 MMO Position, (3) February 2017 MDO Position, and (4) July 2017 MDO Position. While Plaintiff points to several pieces of evidence in support of his position, Defendant contends that USPS selected the most qualified candidates for the positions.

As to the Tour 1 MMO Position and the Tour 3 MMO Position, Plaintiff argues that even though he had experience as an MMO and an MDO and drafted an application that "clearly and objectively" demonstrated this knowledge, skills, and experience, he was "inexplicably" given a zero for two KSAs. (Resp. at 12). This argument is a non-starter for several reasons. First, "[a]n employee's own opinions about [his] qualifications do not give rise to a material factual dispute." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (internal quotations and alternations omitted); *see also Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) ("We have repeatedly stated that plaintiffs must offer more than mere self-serving appraisals.") (internal

alterations omitted). Additionally, Defendant asserts, and Plaintiff does not dispute, that Plaintiff failed to properly address the KSAs in his application and the format of his application "was hard to follow and made it difficult to ascertain his exact work history based on how he grouped his experience together." (Pl.'s Resp. to Def.'s SOF ¶ 34). Moreover, Plaintiff's contention that being ranked as a zero was somehow discriminatory and retaliatory is belied by the fact that despite such a subpar rating, Plaintiff was interviewed for the Tour 1 MMO Position and the Tour 3 MMO Position.

Next, Plaintiff asserts that there is evidence that "retaliation was afoot" because around the time that Plaintiff applied for Tour 1 MMO Position and the Tour 3 MMO Position, Pelech told him "They were wondering why you want to come back to Busse." (Resp. at 13; Def.'s Resp. to Pl.'s SOAF ¶ 9). Plaintiff insists that this statement demonstrates Pelech was in contact with individuals at the Busse facility against whom Plaintiff had filed an EEO complaint. In contrast, Defendant characterizes Pelech's question about Plaintiff's desire to return to Busse so soon after he entered into an agreement to transfer to a different facility as "indicat[ing] nothing more than innocent curiosity." (Reply at 8, Dkt. 69). The Court does not find Plaintiff's argument convincing. "Circumstantial evidence 'must point directly to a discriminatory reason for the employer's action,'" and Pelech's innocuous comment falls well short of this standard. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014) (citing *Mullin v. Temco Mach., Inc.,* 732 F.3d 772, 777 (7th Cir. 2013)).

Plaintiff further contends that Pelech's decision not to award Plaintiff one of the MMO positions was "perplexing" because Pelech conducted Plaintiff's performance evaluations in the past and indicated that Plaintiff's performance was satisfactory. (Resp. at 13). However, Plaintiff is not entitled to promotion based solely on a job rating. *Cullom v. Brown*, 209 F.3d 1035, 1043

(7th Cir. 2000); *Lloyd v. Mayor of City of Peru*, 761 F. App'x 608, 610 (7th Cir. 2019) (noting that a plaintiff who received "two positive statements from superiors about his work" still provided "no evidence" that he was qualified for a promotion). "Put differently, past positive evaluations do not guarantee future employment. Nor does such evidence, without more, show discrimination." *Igasaki*, 988 F.3d at 959.

Turning to the February 2017 MDO Position and the July 2017 MDO Position, Plaintiff contends that the circumstances surrounding the failure to award him either of those positions "is even more bizarre." (Resp. at 13). First, Plaintiff points to the fact that he submitted the same application for both positions, and for the February 2017 MDO Position, he received the highest score, but for the July 2017 MDO Position, he was not even within the top five applications. Plaintiff speculates that the review committee chair, Hillard, provided the first score before he was aware of Plaintiff's EEO activity. Defendant, on the other hand, contends that the discrepancy between Plaintiff's scores can be explained by the fact that there were five additional applicants for the July 2017 MDO Position. Plaintiff challenges this explanation as unsupported since Defendant did not produce the raw KSA scores. But while Defendant may not have offered that data, he did provide other relevant evidence, including the candidate rankings (Ex. 3D, Dkt. 43-8 at 29; Ex. 3E, Dkt. 43-8 at 31) and the candidates' applications (Ex. 3F, Dkt. 43-8 at 33-69; Ex. 3G, Dkt. 43-8 at 71-78) in support of his position. Thus, the Court declines to find that Defendant's explanation for the scores is unsupported.

Next, Plaintiff contends that, even though he had been an MDO for two years and an acting MDO for three years, one of the MDO positions (he does not specify which one) was given to someone who had only served as an acting MDO for less than a year. "Years of experience,

however, are not necessarily determinative of qualifications for a promotion." *Hall, Inc.*, 536 F.3d at 620. Thus, this fact fails to establish causation.

Plaintiff also points to two comments that Pelech allegedly made, which Plaintiff contends reveal a "concerted effort to retaliate against [him]." (Resp. at 14). First, Plaintiff points to April 2017 email communications between he and Pelech, where Pelech suggested that Plaintiff may be "black balled." (Resp. at 13). In the email, Plaintiff told Pelech that he was not selected for a "Palatine job" and stated that "I guess supervisors are better qualified than managers for promotions in USPS." (Ex. 11, Dkt. 57-12). In response, Pelech stated "Unbelievable . . . sounds like you're black balled. I just don't understand it[.]" (*Id*.) Defendant argues that this comment does not establish causation because Pelech was not the decisionmaker for the position that Plaintiff was referring to in the email. The Court agrees.

"An isolated comment or 'stray remark' is typically insufficient to create an inference of discrimination, but it may suffice if it (1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action." *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."). Though the position is not explicitly stated in the email, based on the timing of the email and Plaintiff's description of the position as the "Palatine job," it appears that Plaintiff was referring to his non-selection for the February 2017 MDO Position. It is undisputed that Mayberry, not Pelech, was the decisionmaker for the February 2017 MDO Position. Accordingly, Pelech's statement cannot establish causation.

Second, Plaintiff contends that "after [he] did not receive either of the downgraded SMO positions," he asked Pelech why he was unable to obtain a supervisor level position and Pelech

responded, "You aren't going anywhere. You are going to rot in this position," referring to the MFMO position that Plaintiff held at the time. (Def.'s Resp. to Pl.'s SOAF ¶ 23). Plaintiff applied for the "downgraded SMO positions" in August 2019 and October 2019. (*Id*. ¶ 21). His non-selection for the MDO positions occurred in 2017, more than two years earlier. Plaintiff cannot rely on a comment made two years later to establish that he was not awarded the February 2017 MDO Position or the July 2017 MDO Position for discriminatory or retaliatory reasons. See *Conley,* 215 F.3d at 711 (comment made two years prior to adverse action too remote); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (comment made one year prior to adverse action too remote).

Accordingly, Plaintiff has failed to create a triable issue of fact on whether discrimination or retaliation played a part in his non-selection for the (1) Tour 1 MMO Position, (2) Tour 3 MMO Position, (3) February 2017 MDO Position, and (4) July 2017 MDO Position.

### 2. **Transfers**

Plaintiff also contends that he was retaliated against when he was not awarded the (1) MES Position, (2) August 2019 SMO Position, and (3) October 2019 SMO Position. Plaintiff states that at the time he applied for these positions, the selecting official, Hilliard, was aware that Plaintiff had filed an EEO charge. Plaintiff further asserts that, during his interview for the MES Position, Hilliard said, "We are in different circumstances to talk this time[,]" apparently differentiating between the interview and Hilliard's deposition in the EEO matter. (Resp. at 14).

"[M]ere knowledge of an employee's discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for adverse personnel actions against that employee." *Greer v. Bd. of Educ. of City of Chi.*, No. 99 C 7005, 2000 WL 1808423, at *7 (N.D. Ill. Nov. 9, 2000), *aff'd sub nom. Greer v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d

723 (7th Cir. 2001)). Here, Defendant asserts that USPS choose the most qualified candidate for the positions. While Plaintiff contends that there is "no question" that he was qualified for these positions, (Resp. at 14), as they were downgrades from the position he held at the time, he has not introduced any evidence to suggest that he was more qualified than the employees who were selected for the positions. *See Valdez v. City of Chi.*, No. 20 C 388, 2022 WL 4482816, at *6 (N.D. Ill. Sept. 27, 2022) (finding that plaintiff's retaliation claim failed because "no evidence establishes that he was objectively more qualified than any other candidate, such that it raises suspicions as to why he was not selected."); *Phillips v. Baxter*, No. 16 C 8233, 2023 WL 2664364, at *8 (N.D. Ill. Mar. 28, 2023), *aff'd*, No. 23-1740, 2024 WL 1795859 (7th Cir. Apr. 25, 2024) (finding that plaintiff's sex discrimination claim failed because plaintiff had "no evidence" to demonstrate that the selected candidates were not more qualified than plaintiff, nor could he demonstrate any "fishy" circumstances around their hiring); *Fidishin v. Gary Cmty. Sch. Corp.*, No. 18 CV 97, 2022 WL 326544, at *11 (N.D. Ind. Feb. 2, 2022) ("Except for unsupported speculation about [other employees'] work history, the [p]laintiff provides no evidence that she was more qualified than [the selected employees] to oversee transportation and security. She needs to provide more evidence to survive summary judgment.").

Accordingly, Plaintiff has failed to establish that his non-selection for the (1) MES Position, (2) August 2019 SMO Position, and (3) October 2019 SMO Position was retaliatory.

### 3. <u>Compensation</u>

Finally, Plaintiff argues that he was discriminated against and retaliated against when he was "forced to perform the work of manager and supervisor[] but was only given the lesser of the two positions' pay." (Resp. at 15). But Defendant asserts that Plaintiff's pay was set by a nationwide policy that had nothing to do with discrimination or retaliation against him personally.

23

Plaintiff has failed to point to any evidence to refute this contention and show that "retaliatory animus played a part in an adverse employment action." *Huff*, 42 F.4th at 647; *see also Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.") (internal quotations omitted).

Accordingly, as it relates to compensation, Plaintiff's discrimination and retaliation claims fail as a matter of law.

**<u>CONCLUSION</u>**

For the reasons stated above, Defendant's motion for summary judgment [41] is granted. Judgment is entered in favor of Defendant.

**DATED**: October 1, 2024          **ENTERED**:

LaShonda A. Hunt
United States District Judge